Martha **KINSTLER**, Plaintiff–Appellee,

v.

**FIRST RELIANCE STANDARD LIFE INSURANCE COMPANY,**
Defendant–Appellant.

**Docket No. 97–9384.**

United States Court of Appeals,
Second Circuit.

Argued April 8, 1999.

Decided June 15, 1999.

Michael J. Burns, New York, N.Y. (Timothy C. Russell, Christie, Pabarue, Mortensen & Young, New York, N.Y., on the brief), for defendant-appellant.

Sean E. Stanton, New York, N.Y., for plaintiff-appellee.

Before: WINTER, Chief Judge, NEWMAN, and SOTOMAYOR, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This case primarily requires us to determine the appropriate standard of review, under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* (1994) ("ERISA"), when an ERISA claim is denied because of an adverse determination not only with respect to an interpretation of the applicable benefit plan but also with respect to a factual question. First Reliance Standard Life Insurance Company ("First Reliance") appeals from the September 30, 1997, judgment of the United States District Court for the Southern District of New York (Peter K. Leisure, District Judge) granting summary judgment to Martha Kinstler on her claim for disability benefits under a group long-term disability program governed by ERISA and denying First Reliance's cross-motion for summary judgment. We conclude that the *de novo* standard of review applies to all aspects of the denial of an ERISA claim, including fact issues, in the absence of a clear reservation of discretion to the plan administrator. Since the District Court applied this standard, and properly determined that Kinstler is entitled to disability benefits, we affirm.

## Background

Kinstler was employed as the Director of Nursing Services at Project Return Foundation, Inc. ("Project Return"), a drug rehabilitation center. She participated in Project Return's long-term disability insurance program, which is an ERISA program funded by a policy (the "Policy") issued by First Reliance. In relevant part, the Policy states:

"Totally Disabled" and "Total Disability" mean that as a result of an Injury or

Sickness ... an Insured cannot perform the material duties of his/her regular occupation. We consider the Insured "Totally Disabled" if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis....

The Policy provides monthly disability benefits if the insured "(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to [First Reliance]."

In June 1993, Kinstler was involved in a car accident and, as a result of injuries to her knee, became disabled. She was deemed to be eligible for long-term benefits for a "total disability" under the Policy, and received such payments from September 5, 1993, until December 5, 1994. By letter dated December 9, 1994, First Reliance terminated the payments, stating that medical evaluations of Kinstler indicated that she was capable of returning to work as a director of nursing. This conclusion resulted from the following process.

■ Accepting Kinstler's contention, supported by medical records, that she was disabled from all but sedentary work,[1] First Reliance focused its inquiry on the nature of her job. A First Reliance memorandum recommending further inquiry focused on two responses in an Occupational Demands form, which had been completed by the Coordinator of Clinical Support Services at Project Return. Project Return had indicated (1) that Kinstler's job involved no lifting or carrying and (2) that Kinstler spent 75 percent of the work day sitting and 25 percent standing. The form also indicated that Kinstler's job did not require her to stoop, kneel, reach

above or below her shoulders, or climb or descend stairs or ladders.

First Reliance obtained an opinion from Dr. Scott V. Haig, one of the treating physicians listed by Kinstler on her claim submission, with respect to his evaluation of her disability in light of the Occupational Demands form. In a letter dated April 5, 1994, Dr. Haig stated that Kinstler "should not work in any capacity where she is expected to walk distances more than 50 feet repeatedly[,] carry loads, lift or climb." Dr. Haig concluded that Kinstler's disability "does restrict her in her ability to perform the job duties which she ha[d] described" to him. He further stated that Kinstler "would be capable of performing sedentary type work ... if she is kept in a comfortable position such as near recumbency."

First Reliance then obtained an independent medical examination by Dr. Robert J. Roffman, an orthopedic specialist. In his September 7, 1994, report, Dr. Roffman noted that Kinstler "is not only required to perform her administrative functions, but also [to] participate in direct patient care." In an October 13, 1994, addendum to his report, Dr. Roffman concluded that Kinstler "is not totally disabled with regard to performing the duties of her occupation as a Director of Nursing," noting that "[s]he is capable of functioning in a capacity that does not require her to stand or walk for extended periods of time, kneel, squat or lift (specifically in reference to direct patient care)." In Dr. Roffman's opinion, "[i]f the limitations alluded to above can be adhered to," Kinstler would be "capable of working a full 8 hour day."

Another medical evaluation, performed by Dr. Paul G. Jones for the purposes of no-fault automobile insurance coverage, was also obtained. In his report, Dr. Jones stated that Kinstler "cannot return to her regular job as a floor nurse due to

---

1. In rebuttal at oral argument before this Court, counsel for First Reliance suggested that Kinstler was capable of performing non-sedentary work. We decline to consider this argument, which was not raised either before the District Court nor in the papers submitted to this Court. See, e.g., Thomson v. Larson, 147 F.3d 195, 206 (2d Cir.1998).

the fact that she still requires a cane and is only capable of limited weight bearing and limited use of her left knee." However, he observed that "[s]he could return to work if she only had to do sedentary duties."

Based on these medical evaluations and its understanding that the material duties of Kinstler's regular occupation involved only sedentary tasks, First Reliance determined that Kinstler was no longer totally disabled from performing the material duties of her regular occupation. Accordingly, First Reliance informed Kinstler that her disability benefits would be terminated. Though the termination letter specifically referred to the fact that Kinstler's job "required [her] to sit 75% of the day and stand 25% of the day," the letter noted that the physical requirements of her job "are classified as sedentary activities by the U.S. Department of Labor and Industry."

Kinstler requested a review of the denial of benefits, submitting a copy of her Project Return job description in connection with the request. The job description indicated that Kinstler's job comprised 60 percent administrative duties and 40 percent clinical duties. It also indicated that one of her duties was to respond to health crises if the need arose and that cardiopulmonary resuscitation certification (which requires kneeling) was required. Kinstler's counsel argued that, although a director of nursing in a hospital setting or a large institution with a full nursing staff typically would perform only sedentary activities, Kinstler's regular occupation at a small health care facility like Project Return was not limited to sedentary tasks, and her educational background and work experience precluded her from obtaining employment as a director of nursing in a larger institution. Kinstler also submitted a copy of a Social Security award letter indicating that she would receive disability benefits commencing in December 1993 (*i.e.,* after five consecutive months of disability as required for receipt of Social Security disability payments) until such time as the Social Security Administration determined she was no longer disabled.

As part of the insurer's review, Thomas Hardy, a "vocational specialist" at First Reliance, conducted an assessment of Kinstler's occupation. Hardy's assessment was based on his review of the "OASYS JD" for "Director of Nursing"—the job description given in a vocational profiler computer program, which is apparently based on the occupational definitions contained in the United States Department of Labor's Dictionary of Occupational Titles. According to Hardy's report:

> Review of OASYS JD indicates all material duties of position. [Kinstler] appears able to perform all duties as noted and occupation appears within restrictions placed by Dr. Roffman in his addendum dated 10/13/94. While an objection is raised regarding performance of CPR, this does not appear to be an essential duty of this occupation.
>
> In light of policy language requiring [claimant] to be disabled from *all* duties of her occupation, she does not appear totally disabled.

In a later memorandum, Hardy stated that "[r]eview of vocational information indicates that Ms. Kinstler is capable of sedentary activity: Director of Nursing Service is a sedentary activity." With regard to Kinstler's objection that her position of Director of Nursing at Project Return involved direct patient care and that she could not, based on her education and experience, obtain a purely administrative or managerial position, Hardy noted that Kinstler's attorney

> fail[ed] to take into account that our decision is based not on a specific job as performed at a specific place of employment—rather, we have chose[n] to use the Department of Labor standards as set forth in the Dictionary of Occupational Titles which makes no mention of these [non-sedentary] activities as *essential* functions of this occupation.

Finally, First Reliance obtained an independent peer review of the available medical records. In a report dated May 23, 1995, Dr. Dane K. Wukich stated that he had been asked to review the medical records of Kinstler and "indicate if these medical records support the ability to perform sedentary work," defined to include the lifting of up to ten pounds. Dr. Wukich concluded that the patient would be capable of doing sedentary work. On June 14, 1995, First Reliance sent a letter informing Kinstler that based on the peer review and the conclusions of its vocational expert, it was reaffirming the denial of benefits.

After Kinstler filed a complaint with the New York State Department of Insurance, First Reliance conducted additional reviews of its decision, each time affirming the denial of benefits. In January 1996, Kinstler filed a complaint in New York State Supreme Court, which was removed by First Reliance to the District Court. Kinstler stipulated to dismissal of her state law claims, and the parties cross-moved for summary judgment on her ERISA claim challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B).

In an opinion and order dated July 16, 1997, Judge Leisure granted summary judgment in favor of Kinstler and denied First Reliance's cross-motion. *See Kinstler v. First Reliance Standard Life Insurance Co.*, No. 96 Civ. 921, 1997 WL 401813 (S.D.N.Y. July 16, 1997). The District Court first concluded that First Reliance's denial of benefits was subject to *de novo* review under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), because the policy did not grant First Reliance discretionary authority to determine an insured's eligibility for benefits. *See Kinstler*, 1997 WL 401813, at *6–*7. Turning to the merits of the claim, the Court noted that, since the parties did not dispute that Kinstler was capable of performing sedentary activities, First Reliance's denial of benefits turned on its interpretation of the policy term "regular occupation" and its conclusion that Kinstler's regular occupation was sedentary. *See id.* at *7. The District Court agreed with First Reliance that "regular occupation" should be construed to mean a position "of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Id.* (citation and internal quotation marks omitted). Contrary to First Reliance's position, however, the Court ruled that, under this definition, Kinstler's regular occupation in fact included non-sedentary duties. Judge Leisure pointed out that First Reliance's use of a database definition of "Director of Nursing" was inappropriate since the Occupational Demands form completed by her employer and a position description drafted by her employer indicated that Kinstler's occupation demanded significant non-sedentary activity. *See id.* at *8. Accordingly, the Court held that the denial of benefits was incorrect "as a matter of law." *Id.* The Court also noted that it would have reached the same result under the more deferential arbitrary and capricious standard of review. *See id.* n. 6.

### Discussion

Applying the usual appellate standards for reviewing a district court's grant of summary judgment, we consider first the issue of the standard of review to be used by a district court in its review of a plan administrator's denial of an ERISA claim. Determination of the standard of review requires initial consideration of the nature of the issues presented by the claim in this case.

### I. Nature of the Issues

Judge Leisure stated the "main disputed issue" to be "whether plaintiff's 'regular occupation,' as that term is used in the Policy, is sedentary in nature." *Kinstler*, 1997 WL 401813, at *5. This seemingly straightforward framing of the issue obscures the reality that the issue, thus

framed, presents two disputed questions. First, what is the meaning of the term "regular occupation"? Second, what are the material duties of Kinstler's "regular occupation," once that term has been defined? In some cases, a third question would also be presented: Does a claimant's physical limitation prevent her from performing on a full-time basis at least part of her material duties? In this case, however, the parties are in agreement that Kinstler's physical limitation prevents her from performing non-sedentary tasks on a full-time basis. Thus her claim turns on the answers to only the first and second questions.

The first question clearly requires some interpretation of the Plan. The second question is factual. Breaking down the overall issue into its component parts reveals the need for a court adjudicating Kinstler's claim to consider the standard of review applicable not only to matters of plan interpretation but also to disputes of fact.

## II. Standard of Review

■ In *Firestone*, 489 U.S. at 115, 109 S.Ct. 948, the Supreme Court considered the issue of the appropriate standard for judicial review of benefit determinations by fiduciaries or plan administrators under ERISA. The Court ruled, at least as to the disputed issue in that case, that "[c]onsistent with established principles of trust law, ... a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* Where the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995) (citation and

internal quotation marks omitted); *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir. 1995) (denial is arbitrary and capricious where plan administrator or fiduciary has "impose[d] a standard not required by the plan's provisions, or interpret[ed] the plan in a manner inconsistent with its plain words") (citation and internal quotation marks omitted). The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since "the party claiming deferential review should prove the predicate that justifies it." *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995).

■ *Firestone*, however, does not make clear whether, in the absence of an explicit reservation of discretionary authority, the *de novo* standard applies to all issues concerning denial of benefits or only issues concerning an interpretation of a plan. The four circuits that have explicitly considered this issue are divided. The Third, Fourth, and Seventh Circuits have ruled that the *de novo* standard applies to all issues arising when an ERISA claim denial is challenged under section 1132(a)(1)(B), including fact issues, *see Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1182–84 (3d Cir. 1991); *Reinking v. Philadelphia American Life Insurance Co.*, 910 F.2d 1210, 1213–14 (4th Cir.1990), *Donato v. Metropolitan Life Insurance Co.*, 19 F.3d 375, 379 n. 2 (7th Cir.1994), while the Fifth Circuit applies the *de novo* standard only to issues of plan interpretation, and applies the arbitrary and capricious standard to issues of fact, *see Pierre v. Connecticut General Life Insurance Company/Life Insurance Company of North America*, 932 F.2d 1552 (5th Cir.1991). The Ninth Circuit has applied the *de novo* standard to a fact question, without explicitly noting the issue of whether the standard should apply to fact questions, *see Kearney v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999) (en banc). The Supreme Court, asked to resolve the dispute by granting a

petition for certiorari to review the Fifth Circuit's decision, declined to do so, *see Pierre v. Connecticut General Life Insurance Co.*, 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991), though two justices noted the dispute and urged its resolution, *see id.* (White, J., with whom Blackmun, J., joins, dissenting from denial of certiorari).

*Firestone* offers some basis for supporting both sides of the issue as to the scope of the *de novo* standard. As the Fifth Circuit pointed out, *see Pierre*, 932 F.2d at 1561–62, the Third Circuit in *Firestone* had explicitly not reached the fact question involved in that case, *see Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 n. 9 (3d Cir.1987), and the Supreme Court was therefore not required to determine what standard applies to review of a fact question. Moreover, the Supreme Court's opinion contains an early sentence cautioning that "[t]he discussion which follows is limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits *based on plan interpretations.*" *Firestone*, 489 U.S. at 108, 109 S.Ct. 948 (emphasis added). In addition, the Fifth Circuit noted that trust law, emphasized by the Court in *Firestone* as relevant to the issue of scope of the standard of review, *see id.* at 110–13, 109 S.Ct. 948, generally contemplates according trustees some discretion, especially on factual determinations, thereby implying the appropriateness of an arbitrary and capricious standard for fact-based decisions that are within the scope of a trustee's discretion. *See Pierre*, 932 F.2d at 1562.

■ The Third, Fourth, and Seventh Circuits base their views, supporting use of the *de novo* standard for fact questions, primarily on the sentence in *Firestone* in which the Supreme Court announced its holding:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the admin-

istrator or fiduciary discretionary authority to determine *eligibility for benefits or* to construe the terms of the plan.

*Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (emphasis added). *See Luby*, 944 F.2d at 1182; *Reinking*, 910 F.2d at 1213–14; *Donato*, 19 F.3d at 379 n. 2. As these courts have noted, language the Supreme Court uses when it explicitly announces its holding must be assumed to have been crafted with care, and any reading of *Firestone* that limited the *de novo* standard to issues of plan interpretation would fail to accord any meaning to the apparently deliberate use of the phrase "eligibility for benefits" as an issue distinct from "constru[ing] the terms of the plan." *See, e.g., Petrilli v. Drechsel*, 910 F.2d 1441, 1446 (7th Cir. 1990) (quoting *Firestone*, 489 U.S. at 115, 109 S.Ct. 948).

Further supporting the majority position, the Third Circuit minimized the significance of the early sentence in *Firestone*, announcing the apparent limitation of the opinion to plan interpretations, by pointing out that the thrust of the sentence is to limit the *de novo* standard, not to issues of plan interpretation, but to review in section 1132(a)(1)(B) actions. As the Third Circuit pointed out, *see Luby*, 944 F.2d at 1183, the very next sentence in *Firestone* after the limitation sentence says, "We express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA." *Firestone*, 489 U.S. at 108, 109 S.Ct. 948.

The Third Circuit also advanced the policy consideration that the deferential standard of review applied to fact decisions by government agencies was based on their expertise, whereas many plan administrators are laypersons lacking legal or accounting training. *See Luby*, 944 F.2d at 1183.

In resolving this close question, which has divided other courts, we are inclined to agree with the Third, Fourth, and Seventh Circuits that the language the Supreme Court used in *Firestone* in stating its hold-

ing must be faithfully followed, despite the fact that the language, characterized as a holding, goes beyond the precise issue before the Court in that case. Though we are reluctant to see district courts burdened with the obligation to give *de novo* review to decisions resolving routine fact disputes in section 1132(a)(1)(B) cases, we are reenforced in our conclusion by recognition of the relative ease with which ERISA plans may be worded explicitly to reserve to plan administrators the discretionary authority that will insulate all aspects of their decisions from *de novo* review.

## III. Reservation of Discretionary Authority

■ First Reliance contends that even if *de novo* review is generally available in section 1132(a)(1)(B) cases, the language in its policy is sufficient to reserve to itself the discretionary authority that invokes the arbitrary and capricious standard of review. First Reliance cites the following policy language:

> We will pay a Monthly Benefit if an Insured:
>
> .     .     . .     .     .
>
> (4) submits satisfactory proof of Total Disability to us.

Judge Leisure ruled that this language was insufficient to avoid *de novo* review.[2]

As with the issue of the scope of *de novo* review, appellate judges are divided on the issue of what language suffices to convey to plan administrators the discretionary authority that warrants the more deferential arbitrary and capricious standard of review. This dispute is well illustrated by the Sixth Circuit's decision in *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550 (6th Cir.1998) (in banc), in which eight judges of the Court deemed the phrase "satisfactory evidence" sufficient to preclude *de novo* review, *see id.* at 555–58, and six judges found this phrase insuffi-

cient, *see id.* at 558–61 (Boggs, J., dissenting). The Ninth Circuit, also sitting in banc, has deemed insufficient the phrase "satisfactory written proof." *Kearney,* 175 F.3d 1084. The Seventh Circuit has deemed sufficient the phrase "proof ... satisfactory to us, [i.e., the administrator,]" *Donato,* 19 F.3d at 379 (emphasis added), but has also deemed sufficient the less rigorous phrase "such due proof, as shall be from time to time required," *Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505 (7th Cir.1995) (internal quotation marks omitted).

■ In our Circuit, we have recognized that " 'magic words such as "discretion" and "deference" ' may not be 'absolutely necessary' to avoid a [*de novo* ] standard of review." *Jordan v. Retirement Committee of Rensselaer Polytechnic Institute,* 46 F.3d 1264, 1271 (2d Cir.1995) (quoting *Schein v. News America Publishing Inc.,* No. 89 Civ. 0052, 1991 WL 117638, at *4 (S.D.N.Y. June 24, 1991)). At the same time, we have noted that the use of such words "is certainly helpful in deciding the issue." *Id.* When we have deemed the arbitrary and capricious standard applicable, the policy language reserving discretion has been clear. For example, in *Ganton Technologies, Inc. v. National Industrial Group Pension Plan,* 76 F.3d 462, 466 (2d Cir.1996), the plan explicitly provided that the trustees had authority to "resolve all disputes and ambiguities relating to the interpretation of the Plan." In *Zuckerbrod v. Phoenix Mutual Life Insurance Co.,* 78 F.3d 46, 48 (2d Cir.1996), the policy used the phrase "in our judgment" to modify a determination of eligibility for benefits.

We agree with Judge Leisure that the language of First Reliance's policy is insufficient to preclude *de novo* review. In the first place, it is not clear whether the key language, requiring the claimant to "submit[ ] satisfactory proof of Total Disability

---

**2.** Judge Leisure also deemed insufficient policy language stating, "We consider the Insured

'Totally Disabled' if [certain conditions are met]." *Kinstler,* 1997 WL 401813, at *6.

to us," means only that the claimant must submit *to First Reliance* proof that is satisfactory or that the claimant must submit proof that is *satisfactory to First Reliance.* Since the plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, *see Sharkey,* 70 F.3d at 230, we think the needless ambiguity in the wording of the policy should be resolved against First Reliance.[3] *See Kearney,* 175 F.3d at 1090. If the policy is read to require "satisfactory proof" that must be submitted to First Reliance, then the issue is like that in *Perez* and *Kearney,* and we think the dissenters in *Perez* and the majority in *Kearney* had the better of the argument. As the *Perez* dissenters pointed out, unless a policy makes it explicit that the proof must be satisfactory *to the decision-maker,* the better reading of "satisfactory proof" is that it establishes an objective standard, rather than a subjective one. *See Perez,* 150 F.3d at 559 (Boggs, J., dissenting).

But a more fundamental point than this fine distinction about wording is that the word "satisfactory," whether in the phrase "satisfactory proof" or the phrase "proof satisfactory to [the decision-maker]" is an inadequate way to convey the idea that a plan administrator has discretion. Every plan that is administered requires submission of proof that will "satisfy" the administrator. No plan provides benefits when the administrator thinks that benefits should not be paid! Thus, saying that proof must be satisfactory "to the administrator" merely states the obvious point that the administrator is the decision-maker, at least in the first instance. Though we reiterate that no one word or phrase must always be used to confer discretion-

ary authority, the administrator's burden to demonstrate insulation from *de novo* review requires either language stating that the award of benefits is within the discretion of the plan administrator or language that is plainly the functional equivalent of such wording. Since clear language can be readily drafted and included in policies, even in the context of collectively bargained benefit plans when the parties really intend to subject claim denials to judicial review under a deferential standard, courts should require clear language and decline to search in semantic swamps for arguable grants of discretion.

## IV. The Merits.

Judge Leisure was therefore correct to apply *de novo* review both to the plan interpretation issue of what "regular occupation" means in the Policy, and to the fact issue of what were the material duties of that occupation, properly identified. We agree with the District Court's rulings on both matters.

### A. "Regular occupation"

■ The term "regular occupation" is not defined by the Policy itself. In *Dawes v. First Unum Life Insurance Co.,* 851 F.Supp. 118, 122 (S.D.N.Y.1994), Judge Wood ruled in an analogous case that "the applicable definition of 'regular occupation' shall be a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." The term, she ruled, is "defined more narrowly than any means for making a living, but it is not limited to the insured's particular job." *Id.* We endorse Judge Wood's formulation. That formulation, however, requires consideration of what sort of position is "of

---

3. As the late Judge Wisdom observed, sitting by designation with the Ninth Circuit:

We do not want to encourage an employer to insulate himself from effective appellate review through the abuse of vague phrases that fail to make clear to the employees that the employer will have the final determination of benefit decisions. Employees who lose promised benefits should not lose the additional benefit of judicial review because their employer reserved discretionary power to itself without making that reservation clear.

*Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 (9th Cir.1992).

the same general character as the insured's previous job." In some cases that inquiry will yield an obvious answer, but this will not always be true.

 First Reliance used the job description for "DIRECTOR, NURSING SERVICE" found in the Department of Labor's Dictionary of Occupational Titles. Though Kinstler's title at Project Return was "Director of Nursing," we agree with Judge Leisure that her "regular occupation" may not be defined without some consideration of the nature of the institution where she was employed. Though her "regular occupation" is not to be defined so narrowly as to include only the characteristics of her job at Project Return, it must be defined as a position of the "same general character" as her job, *i.e.*, a director of nursing at a small health care agency, as distinguished from a large general purpose hospital.

B. Material duties of Kinstler's "regular occupation"

 With Kinstler's "regular occupation" thus defined, it is clear, as the District Court ruled, that some material duties of her occupation require performance of non-sedentary tasks, even though at a large hospital, a director of nursing might have only the sedentary tasks identified in the Labor Department's Dictionary. Kinstler's position required her to stand for 25 percent of the work day and to perform clinical duties for 40 percent of the day. Furthermore, she was required to respond to medical crises as needed, to be trained in CPR, and to provide direct patient care when covering for absent nurses. In light of these facts, a position of the same general character as Kinstler's position at an agency like Project Return, "requiring similar skills and training, and involving comparable duties," *Dawes,* 851 F.Supp. at 122, includes some non-sedentary activities, and the evidence is undisputed that she is disabled from performing such tasks. Though her precise duties do not define her regular occupation, in this case they well illustrate the duties of a director of nursing at a small health care facility, and nothing in the record provides any basis for thinking that such a position at a facility comparable to hers requires only sedentary tasks.

Upon *de novo* review of the denial of her claim, the District Court properly awarded benefits.

### Conclusion

The judgment of the District Court is affirmed.