Donald ROBERTON, Plaintiff,

v.

CITIZENS UTILITIES CO., Defendant.

No. Civ. 3:98CV971 TPS.

United States District Court,
D. Connecticut.

Sept. 21, 2000.

Lewis H. Chimes, Garrison, Phelan, Levin–Epstein, Chimes & Richardson, New Haven, CT, for Donald Roberton, plaintiff.

Barbara E. Hoey, Lee Susan Schumer, Kelley, Drye & Warren, New York City, Michael P. Kaelin, Gregory & Adams, Wilton, CT, Joseph M. Pastore, III, Brown Raysman Millstein Felder & Steiner, Hartford, CT, Richard M. Reice, Eric B. Sigda, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, New York City, for Citizens Utilities Co., defendant.

### MEMORANDUM OF DECISION

SMITH, United States Magistrate Judge.

## I. INTRODUCTION

This is an action for damages and declaratory relief brought by the plaintiff, Donald Roberton, against the defendant, Citizens Utilities Co. ("Citizens") brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). The plaintiff is a former employee of the defendant company, and alleges in count one that Citizens violated ERISA when it denied him benefits under the terms of its Split Dollar Agreement ("Agreement"). The plaintiff also claims in count three [1] that the defendant violated ERISA when it did not give him an enhanced pension payment under the "wearaway" provision of the Voluntary Employee Early Retirement Program ("VEERP"). The defendant denies these allegations.

1. The court granted defendant's motion for summary judgment on Count Two of the complaint in a ruling dated February 22, 2000 (docket no. 52).

2. Prior to trial, the parties filed their motions in limine seeking to exclude certain evidence from trial. The court reserved decision on

A bench trial was held June 1, 2, 5, and 6, 2000,[2] pursuant to 28 U.S.C. § 636(c). For the following reasons, the court concludes that the defendant did violate the terms of the Split Dollar Agreement and that the plaintiff is fully vested under the agreement, but that the plaintiff is not entitled to enforce the "wearaway" provision of the "VEERP." Judgment shall enter in favor of the plaintiff on count one, and for the defendant on count three.

## II. DISCUSSION

### A. THE SPLIT DOLLAR AGREEMENT

Count one of the complaint alleges that defendant improperly denied plaintiff benefits under the Split Dollar Life Insurance Agreement and seeks recovery under 29 U.S.C. § 1132(a)(1)(B). For the reasons set forth below, the court awards the requested relief.

#### 1. STANDARD OF REVIEW

■■■ As a threshold matter, in an action to recover benefits under 29 U.S.C. § 1132(a)(1)(B), the court must determine the appropriate standard of review to apply to the plan administrator's decision. See Hotaling v. Teacher's Ins. and Annuity Ass'n of America, 62 F.Supp.2d 731, 736 (N.D.N.Y.1999). Such claims for benefits are "to be reviewed under a de novo standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The party seeking review under the arbitrary and capricious standard bears the burden of proving its applicability because "the party claiming deferential

such motions until such time as the issues were raised at trial, and then adjudicated them at that time. Accordingly, **docket numbers 63, 65,** and **66** have been **granted or denied to the extent discussed at trial,** and should be removed from the pending motion list.

review should prove the predicate that justifies it." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999) (internal quotation marks omitted; quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995)).

■ In order to successfully meet this burden, the administrator must point toward language in the plan "stating that the award of benefits is within the discretion of the plan administrator or language that is plainly the functional equivalent of such wording." *Kinstler*, 181 F.3d at 252. In the case at bar, defendant relies upon language contained in the Citizens Utilities Company Non–Death Benefit Claims Review Procedure for Citizens Utilities Company Split Dollar Agreements ("Split Dollar Procedure"). Specifically, under the subheading "Filing of Benefit Claims," the Split Dollar Procedure states that

> Citizens Utilities company has established a Split Dollar Life Insurance Administrative Oversight Committee to Administer the Split Dollar Life Insurance Program (the "Administrative Committee") and process and determine claims.... All benefit claims ... should be filed with the Administrative Committee.

(Def.'s Ex. RR). In addition, the Split Dollar Plan states, under the heading "Time for Processing Claims," that "[t]he Administrative Committee generally will adjudicate Claims within 90 days of receipt." (*Id.*). Defendant contends that the language set forth in the Split Dollar Procedure[3] is sufficient to confer discretionary authority to interpret the provisions of the Split Dollar Agreement upon the Administrative Committee.

■ The court disagrees with the defendant's contentions, and finds that the de novo standard of review applies to the Split Dollar Plan. Although words such as "adjudicate," "process," and "determine" may have discretionary connotations, in the context of their use in the Split Dollar Procedure they do not rise to the level of the functional equivalent of "discretionary." The Split Dollar Procedure merely sets forth the process for appealing a decision, and does not purport to confer discretionary authority to the Administrative Committee. The court will not infer discretionary authority from possible connotations of words taken out of context.

Examination of recent authority in the Second Circuit supports this conclusion. In *Kinstler*, the court expressly required language above and beyond merely stating the obvious: that the administrator would make the preliminary decision. *See Kinstler*, 181 F.3d at 252 ("Every plan that is administered requires submission of proof that will 'satisfy' the administrator. No plan provides benefits when the administrator thinks that benefits should not be paid! Thus, saying that proof must be satisfactory 'to the administrator' merely states the obvious point that the administrator is the decision-maker, at least in the first instance"). Subsequent cases have reached similar conclusions in construing the language of other plans. *See, e.g., Hotaling*, 62 F.Supp.2d at 737–38 (declining to interpret language setting forth general requirements as conferring discretionary authority); *Barnable v. First Fortis Life Ins. Co.*, 44 F.Supp.2d 196, 203–04 (E.D.N.Y.1999) (same). Because a more definitive, unambiguous statement of discretionary authority is necessary, the defendant has not met its burden of proving the applicability of the arbitrary and capricious standard. Accordingly, the court will apply the de novo standard of review to the Split Dollar Agreement.

### 2. APPLICATION TO EVIDENCE OFFERED AT TRIAL

■ In 1994, Citizens provided Roberton and other high level management per-

---

**3.** Defendant does not cite language in the Split Dollar Agreement itself that purports to confer discretionary authority. Indeed, the court's own examination of the document reveals that it is devoid of such language.

sonnel with an Executive Split Dollar Life Insurance Benefit ("Split Dollar"). The Split Dollar Life Insurance Agreement ("Split Dollar Agreement") provided a death benefit in the amount of four times the employee's base salary, as that term is defined in the agreement, or an annuity equal to the death benefit on the employee's 65th birthday. Under the terms of the agreement, the benefit vested at a rate of 20% per year over a period of five years commencing in January 1994. In addition, if an employee is "involuntarily termi-nat[ed] (other than for good cause)," (Pl. Ex. 5, ¶ 6B at 5), he was to be considered 100% vested, regardless of his years of service.

Significantly, the agreement also protected employees from any demotion or reduction in responsibilities. Paragraph 6A of the Agreement provides in pertinent part:

> The failure of the Employee to be elected or retained in Employee's present position or in another position of equal or greater responsibility, or a material reduction in the employee's authority, functions, duties, or responsibilities (whether or not followed by termination of employment), shall be deemed to be an "involuntary termination (other than for 'good cause')."

(*Id.*, ¶ 6A at 5). Thus, the dispute between the parties in this case can be whittled down to the fact that plaintiff claims he was demoted, entitling him to Split Dollar Benefits, while defendant claims plaintiff was in fact promoted, and then retired on his own, which would render him ineligible for the benefits.

Based on the credible testimony and other evidence adduced at trial, the court finds the following facts. The plaintiff, Donald Roberton, was hired by Citizens Utilities in January, 1991, with the title of Vice–President of Telecommunications ("Telecom"). Roberton oversaw Telecom's regulated telecommunications activity. In this position, Roberton reported directly to Mr. Daryl Ferguson who held the title of President of Telecommunications. The Chief Executive Officer of Citizens, to whom Mr. Ferguson reported directly, was Mr. Leonard Tow. There were several Vice Presidents in the Telecom sector, but Roberton's department was the largest of the Telecom departments.

When Roberton started at Citizen's, the regulated telecommunications activities comprised approximately 130,000 telephone lines, primarily in California and Arizona. Telecom represented approximately 65–70% of Citizens' revenues, and 85–90% of Citizens' net income during Roberton's first year. During this year, Roberton was also given oversight of Citizens' non-regulated telecommunications activities, including AAlert paging, Electric Lightwave (ELI) and Citizens' cellular operations. During the next two years of Roberton's employment, he took on additional responsibilities in the area of telecommunications acquisitions. Roberton had overseen ELI from 1991 through August 1994. In August 1994, ELI was removed from Roberton's supervision within Telecom. After ELI was removed from Roberton's telecommunications sector, it was treated as a completely separate sector reporting directly to Mr. Ferguson.

Roberton's direct supervisor, Daryl Ferguson, began to have serious concerns about Roberton's management of the telecommunications sector in 1994. In his 1994 review of Roberton's performance for 1993, Mr. Ferguson expressed concerns about Roberton's abilities:

> As a team leader, Don plateaued in some ways in 1993. His personal management skills sometimes became highly controlling and intimidating. This tendency probably caused his peers to lower his team leadership scores in 1993. Don is aware of this problem and is trying to deal with it.

(Pl.Ex.12).

During 1994, Mr. Ferguson further documented very serious doubts about Roberton's performance. Mr. Ferguson initiated

a performance improvement plan for Roberton, and sought to justify Roberton's eventual removal from his position overseeing Telecom operations. In a June 24, 1994 memo documenting a discussion with Rod Egdorf, Vice President of Marketing, Telecommunications, Mr. Ferguson memorialized the following statements about Roberton:

> [Roberton's] telecommunications team is gridlocked. In Rod's opinion this is happening for two reasons. First, Don builds one-on-one relationships, not team relationships. Second, he does not tolerate dissenting opinions. Thus, you either follow [plaintiff's] solution or no solution at all.

> [Roberton] is micro-engineering his properties, not leading.

> [Roberton], in Rod's opinion, is a definite alcoholic. Egdorf informed me that his dad is an alcoholic and he recognizes certain behavior. Then, he said that Don has every trait of an alcoholic's behavior, including heavy off-duty drinking.

> Rod also said, "[plaintiff] will kill his own career simply by continuing his profanity before women. He's on the road," said Rod, "to a definite employee suit."

> I informed Rod that we are well aware of this problem. . . . I also encouraged him to play a very active role with [plaintiff's] team to both help [plaintiff] and, as a team, to pick up some of the leadership slack that is missing.

(Pl.'s Ex. 13 at 1–2). These comments reveal the precariousness of plaintiff's position and belie the defendant's mixed-metaphor contention that, at Citizens, Roberton's "ship was always going up."

Based on the credible evidence offered at trial, the court finds that Citizens' CEO, Mr. Leonard Tow, was also aware of these concerns about Roberton. Mr. Ferguson expressed his doubts that Roberton could effectively lead the Telecom team and outlined his plan to ultimately replace him:

> I believe that we may have an individual who cannot make the change as a team-oriented leader. The problem is serious enough where we cannot afford to wait too long. . . . If we don't have significant and dramatic personal change by Don by mid-September, we reassign him where we can use his analytical skills. Two possibilities: head up network engineering or head-up acquisition analysis.

(Pl.'s Ex. 13 at 3). This recommendation, combined with Mr. Ferguson's admission that he and Mr. Tow were aware of problems with plaintiff's job performance demonstrates that Mr. Tow was indeed aware of a problem. The evidence shows that between July 1994 and January 1995, Mr. Ferguson repeatedly documented and raised performance and management issues relating to Roberton to Mr. Tow.

The evidence also shows that Mr. Tow agreed to remove Roberton from his position supervising Citizens' Telecommunications operations. Roberton and Mr. Ferguson met on January 30, 1995, to discuss his performance. Mr. Ferguson addressed the perception that Roberton was a "bully and an intimidator," and the fact that Roberton's peer review surveys for 1994 were the lowest for any of Citizen's managers. In an "Evaluation" of Roberton that Mr. Ferguson drafted after this meeting, Mr. Ferguson noted the following:

> While [Roberton] brings basic Telecom experience to his position, his own role model is presenting the exact opposite example that we are trying to impart to others. For this reason alone, we have a serious problem. Don Roberton needs to be transferred to a *narrower* job and this needs to be done now.

(Pl.'s Ex. 17) (emphasis added).

While there were a myriad of documented examples of Mr. Ferguson's doubts about Roberton's skills and abilities presented during trial, this memo in particular cuts to the heart of the case. Though the defendant elicited testimony at trial that the change in Roberton's job was, if anything, a promotion, Mr. Ferguson in

fact thought Roberton was a "problem," and that he needed to be in a job "narrower" than Vice President–Telecom. Also, Mr. Tow testified that, in his view, plaintiff "lacked gentility." (Tow Tr. at 13). He also testified that the plaintiff managed "with a heavy hand and frequently with a foul mouth." (*Id.*). These are not normally criteria for a promotion, or even retention in a position of responsibility. Thus, Mr. Tow's testimony in this regard actually lends support to Roberton's argument that his change of position at Citizens was not a promotion, or even a lateral transfer, but constituted a significant reduction in his authority, functions, duties and responsibilities, an occurrence triggering paragraph 6A of the Split Dollar Agreement.

Furthermore, less than two weeks after his meeting with Mr. Ferguson and the drafting of the aforementioned memo, Roberton was removed from his position of Vice President, Telecommunications. In a meeting with Mr. Tow in early February, Roberton was pressured by Mr. Tow to immediately give up his position as Vice–President in charge of Telecommunications Operations and take a "front office" position entitled Vice–President, Strategic Development Telecommunications, and Assistant to the Chairman. Mr. Tow professed health concerns, a desire to improve the quality of Roberton's life, and Roberton's alleged inability to delegate, as the reasons why he wanted to make the change. Mr. Tow did not give Roberton any time to consider the change or any opportunity to refuse the new position. Mr. Tow removed Roberton from his position as Vice–President, Telecommunications in response to Mr. Ferguson's increasing dissatisfaction with Roberton's performance as manager of Citizens' Telecommunications operations.

The court finds that the credible evidence presented at trial proves that the removal of ELI from Roberton's supervision and the creation of ELI as a completely separate sector also constituted a material decrease in Roberton's function, authority, duties and responsibilities. As Vice President–Telecommunications, Roberton had been responsible for full Profit and Loss results of the entire telecommunications lines of business. Roberton had responsibility for over 3,000 employees and operations that constituted over 80% of corporate revenue, and 90% of corporate net income. Roberton also had significant responsibilities for all acquisition activity associated with the telecommunications line of business, including two major acquisitions that quadrupled the size of the telecommunications sector.

After the change to Vice President—Strategic Development of Telecommunications, Roberton functioned as a telecommunications acquisitions "analyst." In this position, Roberton was responsible for the supervision of only a secretary, whom he shared. The nature of Roberton' s duties after the reassignment coupled with the reduction of his workload compel the conclusion that the change in title was not a lateral move, and was certainly not a promotion.

The court also concludes that the change in position from Vice President Telecommunications to vice President Strategic Development Telecommunications was a material reduction in the plaintiff's duties which triggered the vesting provision found in section 6A of the Split Dollar Agreement. When Mr. Roberton's job was changed to Vice President—Strategic Development of Telecommunications, his duties and responsibilities were diminished. He was actually responsible for a mere portion of the job he previously had as Vice President Telecommunications. His duty as V.P. Strategic was acquisitions. His duties as V.P. Telecom included, among many other things, this same level of acquisitions work. His job was effectively reduced by well more than half. The fact that he "reported directly" to the chairman when he had previously reported directly to Mr. Ferguson is immaterial to this determination.

The test, as conceived by Citizens in its own contracts, is whether there was "a material reduction in duties and responsibilities." The test is not whether Mr. Roberton appeared to be pleased or excited by the change. The test is not whether Citizens' executives, after the fact, say it was a "promotion." The test is not whether Mr. Tow[4] or Mr. Ferguson believe it was not a "demotion." The test is simply whether there was a "material reduction" in Mr. Roberton's duties and responsibilities. The evidence presented at trial compels the conclusion that as Vice President Strategic Development, Mr. Roberton experienced a material reduction in his duties and responsibilities. When Mr. Roberton's job was changed, the Split Dollar Benefit vested in full.

The court finds that the plaintiff is one hundred (100) percent vested under the Split Dollar Agreement in an amount stipulated to be $1,354,298.00, and is entitled to this sum pursuant to the terms of the Split Dollar Agreement.

## C. THE WEARAWAY PROVISION

The court also heard testimony pertaining to count three of the complaint, which, pursuant to 29 U.S.C. § 1132(a)(1)(B), challenges the administrator's decision to deny benefits allegedly due under the "early out program" of the Citizens' Pension Plan, the VEERP.

### 1. STANDARD OF REVIEW

The same principles discussed above pertain to the instant determination.

However, with regard to the VEERP, plaintiff does not claim that the language of the plan itself does not confer discretion upon the administrator,[5] but rather argues that a conflict of interest has influenced the administrator's decision, thereby warranting application of a less deferential standard of review.

When the plan at issue confers discretionary authority upon the administrator, the reviewing court must apply the "more deferential arbitrary and capricious standard, and may be overturned only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kinstler*, 181 F.3d at 249. However, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire and Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948. Thus, in the instant case, the arbitrary and capricious standard applies, with any alleged conflict of interest being one factor in the court's review of the administrator's decision. *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995).

The Second Circuit has set forth the analysis for weighing the effect of a conflict of interest:

> Two inquiries are pertinent. First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact

4. Mr. Tow's view of the change in position is in no small part fueled by his own opinion of his importance to the company:

> And since my activities were the most important activities in the mind's eye of the board, and I was stretched in many ways, appointing [plaintiff] as my assistant, as my principal strategic officer, *as my principal communicant to the communications world* that might potentially be available to us, was an extremely important step for me to take, for the company to take.

(Tow Tr. at 10, emphasis added). It is strange indeed that Mr. Tow would seek as his "principal communicant to the communications world" as man whom he describes as having a "foul mouth" and "lack[ing] gentility." (*Id.* at 13).

5. Plaintiff has stipulated to the fact that the "Citizens Pension Plan reserves its administrator the discretionary authority to determine eligibility foe benefits and to construe the terms of the plan." (Pl.'s Proposed Finding of Fact and Conclusions of Law, ¶ 237 at 60).

influenced by such conflict. If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo. *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255–56 (2d Cir.1996). The burden rests upon the plaintiff to demonstrate that there is another reasonable interpretation of the plan, and that the administrator was actually influenced by the conflict of interest. *See id.* at 1259. As discussed below, plaintiff has not met this burden.

## 2. APPLICATION TO EVIDENCE OFFERED AT TRIAL

 The Voluntary Enhanced Early Retirement Plan ("VEERP") is an amendment to the Citizen's Pension Plan. This program was established in June 1995 and offered enhanced benefits for those employees who chose to retire before their established retirement dates. The requirements for this program were: 1) the employee must have been active as of June 1, 1995; 2) the employee must have been at least 55 years of age when he retires; and 3) the employee must have had 5 years of service at the date of retirement. (*See* Def.'s Ex. DD at 2). Employees who met these criteria could elect to receive certain enhanced pension benefits under the VEERP.

At issue in this case is a "wearaway" provision that is best described as a service years enhancement. Beginning in June of 1995, an employee who retired prior to January 31, 1998 received extra service credit. The earlier the employee retired, the more credit he received, up to the date of January 31, 1998. If an employee retired in June 1995, for example, he would receive an extra two and a half years of service to put toward the calculation of his pension benefits. If he retired

in December of 1997, however, he would receive only one month of extra service credit. The benefit wears away the longer one waits to retire, hence the name "wearaway." [6]

The parties' disagreement on this issue is easily distilled. The defendant argues that this wearaway benefit is part and parcel of the VEERP program and is thus available only to employees who are eligible for the VEERP. Roberton is not eligible for the VEERP because he retired before he turned 55. He argues, however, that employees who are non-VEERP eligible can still receive this wearaway benefit because it is separate and apart from VEERP. According to plaintiff, this extra benefit is really the "non-VEERP wearaway," the only requirement for which is the five years of service he had at the time of retirement. Both parties have presented knowledgeable experts who attest to their conflicting interpretations of the pension programs.

The wearaway provision comes down to a question of contract interpretation. Ms. Sushil Nehra and Mr. Alex Ross gave testimony to the fact that eligibility for the wearaway provision was separate from eligibility for the VEERP. Ms. JoAnn Farrall, who is the current plan administrator, testified that, in order to be eligible for the wearaway provision, one must have been eligible for the VEERP program. Plaintiff did not offer any contemporaneous supporting paperwork to support his witnesses' competing interpretation of the provision. Though his witnesses were credible and their interpretation plausible, the plaintiff did not offer enough evidence to counteract the overwhelming evidence offered by defendant. The testimony of Ms. Farrall was credible, and the offer of both the plan summary (*see* Def.'s Ex. DD) and the pension plan amendments (*see* Def.'s Ex. ZZ at 7–8) supports her interpretation of the wearaway provision. De-

---

**6.** The court notes that this term is a misnomer as it refers to what happens if the benefit is not taken, as opposed to referring to the benefit itself. To that end, plaintiff's witness, Ms. Nehra, refers to the "wearaway" as the "window" program.

fendant's interpretation of the plan is reasonable and is supported by the weight of the evidence presented at trial.

Regarding the second inquiry mandated by the Second Circuit in *Sullivan,* the court finds that there is insufficient evidence indicating that the plan administrator chose its interpretation of the plan as a result of the conflict of interest. In support of its argument that the administrator's decision was motivated by a conflict of interest, plaintiff offers the following facts: (1) the fact that defendant administers its own pension plan; (2) the history of hostility between plaintiff and defendant's CEO Mr. Tow; (3) the fact that plaintiff and defendant were already embroiled in a dispute over the Split Dollar Agreement; (4) the fact that Richard Reice, defendant's counsel in this matter, handled the claim on behalf of defendant; and (5) the timing of the formal amendment to the policy. (*See* Pl.'s Proposed Findings of Fact and Conclusions of Law, ¶ 240 at 61). Plaintiff argues that these facts prove that the administrator was in fact swayed by a conflict of interest.

Such evidence does not satisfy plaintiff's burden of proof. Plaintiff correctly points out that, when the administrator and the employer are the same entity, a conflict of interest is possible. Also, the tempestuous relationship demonstrated at trial is also a factor to be considered. Nevertheless, the court does not agree that the supporting facts indicate that the administrator was influenced by a conflict. The fact that Attorney Reice did not respond to the plaintiff's letters requesting a review is inapposite; the claim had already been denied by Mr. Dennis Jones, a pension specialist, prior to referral to Attorney Reice. Also, the timing of the amendment to the pension plan alone, without more, is insufficient for the court to impute a sinister motive to the defendant. Thus, plaintiff is left with the unextraordinary evidence that defendant and administrator were one in the same, and that the parties were at odds, which does not convince the

court that the decision to deny benefits to plaintiff was in fact motivated by a conflict of interest. *See Boesel v. Chase Manhattan Bank,* 62 F.Supp.2d 1015, 1030 (W.D.N.Y.1999) (holding that a common employer and administrator does not necessarily influence the administrator's decision); *but see Sullivan,* 82 F.3d at 1256–57 (affirming decision to deny summary judgment to defendant when administrator and employer were one in the same, the plan was unfunded, and the company was in financial distress).

██ Accordingly, the plaintiff failed to meet his burden of proof. The court finds that the plaintiff is not entitled to enhanced pension benefits under the wearaway provision, because defendant's decision to deny him these benefits was not arbitrary and capricious.

## IV. *CONCLUSION*

For all of the above reasons, on count one of the complaint a judgment shall enter that the plaintiff's Split Dollar Benefit is one-hundred percent (100%) vested, in an amount stipulated to be $1,354,298.00, under the Split Dollar Agreement. Judgment shall enter for the defendant on count three of the complaint. Pursuant to Local Rule 9(f), the court will entertain a proper motion for attorney's fees within thirty (30) days from the date of this ruling.

**IT IS SO ORDERED.**