Anna FAY and Louis Fay,
Plaintiffs–Appellees,

v.

OXFORD HEALTH PLAN,
Defendant–Appellee,

Mount Sinai Medical Center Point-of-Service–Plan, Defendant.

Docket No. 01–7135.

United States Court of Appeals,
Second Circuit.

On Submission: Sept. 26, 2001.

Decided: March 27, 2002.

---

Mark Scherzer, Law Office of Mark Scherzer, New York, NY, for Plaintiffs–Appellants.

Allan B. Taylor, Day, Berry & Howard, Hartford, CT, Arthur J. Ciampi, Morrison, Cohen, Singer & Weinstein, LLP, New York, NY, for Defendant–Appellee Oxford Health Plan.

Frederick A. Brodie, Winthrop, Stimson, Putnam & Roberts, New York, NY, for Defendant Mount Sinai Medical Center Point–of–Service–Plan.

Michael Schuster, Law Office of Michael Schuster, Washington, DC, Stuart R. Cohen, Sara Lenz Lock, Dorothy Siemon, AARP Legal Foundation, for Amicus Curiae American Association of Retired People ("AARP"), Washington, DC.

Anne Davis, New York City Chapter of the Multiple Sclerosis Society, New York, New York, for Amicus Curiae New York City Chapter of the Multiple Sclerosis Society.

Before KEARSE, MINER, and F.I. PARKER, Circuit Judges.

F.I. PARKER, Circuit Judge.

This is an appeal from a January 3, 2001 judgment of the United States District Court for the Southern District of New York (John S. Martin, Jr., *Judge*) dismissing the complaint of plaintiffs-appellants Anna and Louis Fay upon summary judgment motion of defendant-appellee Oxford Health Plan of New York. The Fays claimed, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, coverage for 24–hour private in-home nursing care for Louis Fay under the employee benefits plan in which Anna Fay, through her employment at Mt. Sinai Medical Center, is a participant. We affirm the district court's conclusion that the Fays are not entitled to the 24 hour, in-home care they desire because such care is not generally covered by the Fays' health care plan and because the health plan has determined such care is not medically necessary in Mr. Fay's case.

### I.

There is no dispute about Louis Fay's medical condition. Mr. Fay has multiple sclerosis, diagnosed in 1961, and diabetes mellitus. Mr. Fay is quadriplegic, is totally dependent in all self care, has a tracheostomy, and is ventilator-dependent due to respiratory insufficiency. Mr. Fay is competent, and although unable to speak, communicates using a letter board. Although Mr. Fay's condition is severe, his health insurance carrier need only provide those services promised in its contract provisions. Despite its empathy for Mr. Fay and his family, this Court finds that the contract does not extend to the 24–hour, in-home care Mr. Fay desires.

### II.

Since 1992, Mr. Fay has received 24–hour nursing care at his home to assist with mechanical ventilation and a tracheostomy, and to manage his diabetes through

injections and blood glucose monitoring.[1] Anna Fay, who works for Mt. Sinai Medical Center, receives health care benefits through her employer. Louis Fay, her husband and dependent, also receives these benefits. Prior to 1996, Mt. Sinai offered an Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), plan through Aetna which included a benefit for 24–hour in-home private duty nursing. Mr. Fay received such a benefit. As of January 1, 1996, however, Mt. Sinai chose to offer its health plan benefits through Oxford Health Plans.

### A. The Mt. Sinai/Oxford Point–of–Service Plan ("the Plan")

The Plan describes coverage for participants as follows:

> A Member shall be entitled to receive the following medical care and services of Physicians, Surgeons, and other Plan Providers as set forth in Attachment A, including medical, surgical, diagnostic, therapeutic, and preventive services, which are generally and customarily provided in the area, which are determined by Health Plan to be Medically Necessary AND WHICH ARE PERFORMED, PRESCRIBED, DIRECTED OR AUTHORIZED IN ADVANCE BY MEMBER'S PRIMARY CARE PHYSICIAN, OR HEALTH PLAN.

The body of the Plan sets out the details of plan administration, including eligibility, termination of coverage, and limitations of coverage, and provides definitions of key terms like "Medically Necessary"[2] and "Medical Director."[3] The specific details of the Plan's coverage appear in Attachment A's "Schedule of Benefits and Exclusions." Introducing these benefits, Attachment A first explains that "all services and benefits under this Certificate are available . . . only if and to the extent that they are Medically Necessary and are provided, authorized or directed by Member's Primary Care Physician or Health Plan." The Attachment then establishes the parameters for several key aspects of the Plan's health care coverage.

Attachment A defines "Medical Care" as including "Medically Necessary medical care and services, including office visits and consultations, Hospital and Skilled Nursing Facility visits, and periodic physical examinations . . . when authorized in advance by Member's Primary Care Physician and/or Oxford as required under the terms of this Certificate." It also expressly defines "Home Health Care" to include (1) house calls and, (2) home care, further defined as:

> [c]are in the home by Physician-supervised health professionals other than Physicians, provided by a state licensed or certified Home Health Agency within the Service Area when authorized in advance by Member's Primary Care Physician and Health Plan. Such care

---

1. This care is characterized alternatively as "private duty nursing" or full-time, in-home care.

2. "Medically Necessary" services and/or supplies means those provided by a Hospital, Skilled Nursing Facility, Physician or other provider . . . which, as determined by Health Plan's Medical Director, are:

   1. Consistent with the symptoms or diagnosis and treatment of Member's condition, disease, ailment or injury;

   2. Appropriate with regard to standards of good medical practice;
   3. Not solely for the convenience of the Member, his or her Plan Physician, Hospital, or other health care provider; and
   4. The most appropriate supply or level of service which can be safely provided to the Member.

3. " 'Medical Director' means a Physician designated by Health Plan to monitor appropriate utilization of health services by Members."

shall be limited to two hundred (200) home care visits per contract year. For the purpose of this Certificate, a visit is defined as treatment of up to 4 hours by an eligible home health provider. Home care includes (i) part-time or intermittent home nursing care by or under the supervision of a registered professional nurse (R.N.), (ii) part-time or intermittent home health aide services which consist primarily of caring for the Member, (iii) physical, occupational, or speech therapy where provided by the home health service or agency, and (iv) medical supplies, drugs and medications prescribed by a Participating Physician, and laboratory services by or on behalf of a certified home health agency to the extent such items would have been covered or provided hereunder if the Member had been hospitalized or confined in a Skilled Nursing Facility.

The Attachment then explains that "Skilled Nursing Facility" ("SNF") services may include "non-custodial care which is Medically Necessary for 200 days per Member per calendar year," but not "[c]ustodial, convalescent or domiciliary care in an SNF or elsewhere."

Having detailed these available areas of coverage, Attachment A next sets out several explicit exclusions, including "[p]rivate or special duty nursing," i.e., full-time, in-home care. Specifically, the Plan states, "[e]xcept as specifically provided in any Attachment hereto, the following services and benefits are excluded from coverage hereunder .... (13)[p]rivate or special duty nursing, unless determined to be Medically Necessary and approved in advance by Health Plan."

Attachment C to the Plan outlines the Grievance Procedure, which consists of four elements: (1) the Member who is dissatisfied files a complaint with a Customer Service Associate, who investigates and attempts to achieve a resolution, and notifies the Member of such resolution within fifteen days; (2) if the Member is still dissatisfied, she may file a written complaint with the Issues Resolution Department ("IRD"), which conducts a review and provides a written response within fifteen days; (3) if still dissatisfied, the Member may file a formal written grievance with the Grievance Review Board, composed of a committee of Health Plan employees designated by the Health Plan's Board of Directors, that issues a decision within fifteen days; and (4) if still dissatisfied, the Member may appeal in writing to the Board of Directors by letter to the Secretary of the Grievance Review Board. An appeals committee designated by the Board of Directors reviews the final appeal, holding a hearing if the Member so desires. The appeals committee issues a "final ruling" within fifteen days.

### B. *Oxford's Coverage of Care for Mr. Fay*

In 1996 and 1997, Oxford provided to Mr. Fay coverage for 24–hour private duty nursing care, under the Plan's "Home Health Care" and "Skilled Nursing Facility" provisions. Both items of coverage had annual limits: (1) the home health benefit provided 200 visits, of 4 hours each, per year (33 days of 24–hour per day care); and (2) the SNF benefit provided 200 days of coverage in such a facility. For 1996 and 1997, Oxford agreed to convert the 200 SNF days to cover Mr. Fay's home care "provided that his condition continue[d] to meet the criteria for Home Care," giving a total of 233 days of private duty coverage. Oxford informed the Fays, however, that when the Fays exhausted these benefits, Oxford would no longer cover full-time, in-home care for the remainder of the year. In 1996, Mt. Sinai agreed to cover the remainder of the days, as "an interim solution and an exception to [the] contract

provisions." In a letter to Mrs. Fay, Mt. Sinai advised that "Mount Sinai will not extend the extra contractual benefits into 1997" and that Mrs. Fay should pursue other coverage and funding options.

As warned, Oxford notified the Fays that coverage for home nursing services would cease on August 21, 1997, and that they should inquire as to other funding options. Oxford enclosed with its notification letter a list of federal and state agencies from which the Fays might seek additional funds. In 1998, Oxford did not approve the Fays' request for home care benefits, claiming that such coverage was neither covered by the Plan nor "medically necessary," as that term is used in the Plan. While Oxford approved the 200 "home care" visits (33 days of 24–hour per day coverage) for 1998, it refused to "convert" the 200 SNF days as it had in 1996 and 1997. No home nursing care benefits have been paid since that time.

## C. *District Court Proceedings*

The Fays filed this lawsuit against Oxford Health Plan of New York, Inc.[4] and the Mount Sinai Medical Center Point of Service Plan on January 20, 1998. The Fays sued to recover plan benefits, pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), which provides that "a civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[5]

Upon the parties' cross-motions for summary judgment, the district court granted defendants' motions and denied the plaintiffs' motion. *Fay v. Oxford Health Plans,*

No. 98 Civ. 0350 (JSM), 1998 WL 437159 (S.D.N.Y. July 31, 1998). The district court concluded that the Plan was not a proper party, because it was incapable of providing the requested relief, as the Plan had specifically assigned to Oxford the responsibility for coverage determination and benefit payment. *Fay,* 1998 WL 437159, at *2. The Fays do not appeal this dismissal. The district court then granted Oxford's motion for summary judgment "on the basis that plaintiffs have failed to exhaust administrative remedies." *Id.*

Thereafter, the Fays exhausted the Plan's grievance procedures. The IRD issued a written decision on October 29, 1998, stating that coverage was denied "both because private duty nursing is not a covered benefit under Mr. Fay's Oxford policy and because, in the opinion of Oxford's Medical Director, the home nursing being provided to Mr. Fay is not Medically Necessary" as it is not "the most appropriate supply or level of service which can safely be provided." The Grievance Review Board upheld the IRD's denial of in-home care in a March 30, 1999 letter, stating that the Home Care benefit is appropriate for "part-time or intermittent nursing care only" and not for the 24–hour nursing care requested. The Fays appealed to the Grievance Committee, which, on June 30, 1999, upheld the denial of coverage stating that private duty nursing is excluded from coverage, except in cases where the Medical Director determines it to be medically necessary, and that, here, no such determination was made.

The district court restored the action to its active calendar after Oxford's final determination denying coverage. After initial discovery, Oxford and the Fays again

---

**4.** We note that Oxford has informed the Court that its proper name is "Oxford Health Plans (N.Y.), Inc."

**5.** There is no dispute that Anna Fay is a "participant" and the Louis Fay is a "beneficiary." *See* 29 U.S.C. § 1002(7) & (8).

cross-moved for summary judgment. On January 3, 2001, the district court issued a memorandum opinion and order, granting Oxford's motion. *Fay v. Oxford Health Plans*, No. 98 Civ. 0350(JSM), 2001 WL 8592 (S.D.N.Y. Jan. 3, 2001). The district court first concluded that "Oxford's contract with Mt. Sinai does not require it to provide unlimited twenty-four hour private duty nursing care at home, even if such care is determined to be medically necessary." *Id.* at *1. The district court reasoned that the "private duty nursing" exclusion could not be read to obligate Oxford to provide such benefits, even if medically necessary, because such an interpretation contravened the plain language of the Plan. *Id.* at *2. The district court then concluded that, even if the Plan could be read to obligate Oxford to provide such coverage, "the determination by Oxford's Medical Director that Mr. Fay could best be cared for in a skilled nursing facility would be sustained." *Id.* at *3. The district court noted its previous conclusion that the Plan gave the Medical Director discretion to make medical necessity determinations and that, therefore, the court could overturn decisions of the Director only if it found those decisions arbitrary and capricious. *Id.* at *3. The district court explained, however, that the Fays' claim would fail under either an arbitrary and capricious or a de novo standard of review. *Id.* at *4. The court then dismissed the Fays' complaint. *Id.* at *5.

### D. *Claims on Appeal*

On appeal, the Fays raise several challenges to the district court's grant of summary judgment: (1) The district court incorrectly concluded that the plan unambiguously excludes coverage for private duty nursing coverage; (2) the district court erroneously deferred to the Medical Director's opinion as to the Medical Necessity of in-home care for Mr. Fay; and (3) the district court improperly accorded privileged status to a document prepared by Oxford's in-house counsel, Gary Burfoot.[6] Because this Court finds the first two issues dispositive, it does not reach the third issue. The court also rejects the Fays' alternative claim for damages.

### III.

### A. *Standard of Review*

This Court reviews a district court's grant of summary judgment de novo. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). Summary judgment is appropriate only where the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56.

"ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir.1996). The Supreme Court has held, however, that "a denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eli-

---

**6.** The AARP and the New York City Chapter of the Multiple Sclerosis society filed an amicus curiae brief in support of the Fays. They argued first that this Court should adopt a de novo standard of review because "Oxford's decision denying benefits was unduly influenced by a conflict of interest." They argued further that even under a more deferential standard, Oxford's decision was arbitrary and capricious because Oxford ignored substantial evidence demonstrating adverse health consequences of placing someone like Mr. Fay in a nursing home, failed to give appropriate weight to the Fays' expert opinions, and succumbed to the improper influence of the substantial costs of providing private duty care.

gibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The plan administrator bears the burden of proving that the deferential standard of review applies. *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir.1999). Although express use of the terms "deference" and "discretion" in the plan is not necessary to avoid a de novo standard of review, this Court will construe ambiguities in the plan's language against the insurer. *Id.* at 251–52. Where such discretionary authority is reserved, denials may be overturned as arbitrary and capricious only if the decision is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Id.* at 249 (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995)).

### 1. *Discretion in the Plan*

█ The Plan invokes discretion by defining "Medically Necessary" as those services which, *"as determined by [the] ... Medical Director,"* meet four listed requirements. (emphasis added). This phrase grants Oxford discretionary authority as to determinations of what is "Medically Necessary," but does not afford Oxford broader discretion to construe other Plan terms. Thus, while this Court will review determinations of medical necessity with deference to the findings of the Medical Director under an arbitrary and capricious standard, *see Zuckerbrod,* 78 F.3d at 49, it will review other exercises of the agreement de novo, *see Bruch,* 489 U.S. at 115, 109 S.Ct. 948. Even under de novo review, however, the Fays' claim that the Plan generally provides the 24–hour home health care requested fails.

### B. *Plan Interpretation*

█ ERISA plans are construed according to federal common law. *Masella*

*v. Blue Cross & Blue Shield of Conn., Inc.,* 936 F.2d 98, 107 (2d Cir.1991). This Court will review the Plan as a whole, giving terms their plain meanings. *See, e.g., Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 148 (2d Cir.1993) ("Where the [contract] language is plain and unambiguous, a court may construe the contract and grant summary judgment."); *Bradwell v. GAF Corp.,* 954 F.2d 798, 800 (2d Cir.1992) ("In construing the policy, we look to the language of the policy and other indicia of the intent of the policy's creator."). Where there are ambiguities in an ERISA plan that this Court is reviewing de novo, those ambiguities are construed in favor of the plan beneficiary. *Masella,* 936 F.2d at 107. "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire ... agreement." *O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.,* 37 F.3d 55, 59 (2d Cir.1994) (internal quotation marks and citations omitted). "Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *Id.* at 58–59 (internal quotation marks and citations omitted).

### 1. *General Benefits*

█ Three Plan provisions are crucial to resolving the Fays' claim: the "Medical Care," "Home Care," and exclusion provisions. Read together, these provisions demonstrate that the full-time, private duty home nursing the Fays desire is generally unavailable under the Oxford Plan. In Attachment A, the Plan lays out a detailed schedule of benefits and exclusions. Under "Professional Services Performed Within Health Plan's Service Area," the Plan describes both "Medical Care" and "Home Health Care." Because

of the importance of these provisions to the outcome of the Fay's case, they are reproduced in pertinent part here. The Medical Care Provision provides that:

Medically Necessary medical care and services, including office visits and consultations, Hospital and Skilled Nursing Facility visits, and periodic physical examinations as described in Attachment D hereto, are covered in accordance with the terms of this Certificate when authorized in advance by Member's Primary Care Physician and/or Oxford as required under the terms of this Certificate.

The Fays read this provision as guaranteeing all services that are "medically necessary." Thus, the Fays argue that because private duty nursing is, in their view, medically necessary for Mr. Fay, the Plan should cover his full-time, in-home service. The Fays, however, neglect the impact of the subsequent "Home Health Care" provision also contained under "Professional Services Performed Within Health Plan's Service Area." The "Home Health Care" provision provides details on in-home services not specifically listed under the "Medical Care" provision:

b. Home Care. Care in the home by Physician-supervised health professionals other than Physicians, provided by a state licensed or certified Home Health Agency within the Service Area when authorized in advance by Member's Primary Care Physician and Health Plan. Such care shall be limited to two hundred (200) home care visits per contract year. For the purpose of this Certificate, a visit is defined as treatment of up to 4 hours by an eligible home health provider. Home care includes (i) part-time or intermittent home nursing care by or under the supervision of a registered professional nurse (R.N.), (ii) part-time or intermittent home health aide services which consist primarily of caring for the Member, (iii) physical, occupational, or speech therapy where provided by the home health service or agency, and (iv) medical supplies, drugs and medications prescribed by a Participating Physician, and laboratory services by or on behalf of a certified home health agency to the extent such items would have been covered or provided hereunder if the Member had been hospitalized or confined in a Skilled Nursing Facility.

The Fays attempt to dismiss the limitations of the Home Care Provisions (200 home care visits of up to 4 hours each per year), claiming that this provision addresses only short-term, in-home care and does not address the "private duty nursing" (full-time, in-home care) they desire. This provision demonstrates, however, that *only* short-term care, not the full-time care the Fays seek, is generally available under the Plan. The private duty nursing the Fays desire does not appear in the plain language of either the Medical Care or Home Care provisions. As discussed below, the Plan directly addresses such full-time, in-home care, only as a specific *exclusion* from regular coverage.

### 2. Specific Exclusions

Under the Final Section of the Plan's "Schedule of Benefits and Exclusions," the Plan lays out thirty-five specific exclusions from coverage. The Plan provides in relevant part:

Except as specifically covered in any Attachment hereto, the following services and benefits are excluded from coverage hereunder....

13. Private or special duty nursing, unless determined to be Medically Necessary and approved in advance by Health Plan.

The Fays' claim for full-time, in-home nursing care falls squarely within this exclusion. The Fays read the language of the exclusion to require that Oxford provide private or special duty nursing generally, barring from coverage only that care *not* found "Medically Necessary." They argue that the exclusion would be unnecessary if such services were not generally available. This interpretation, while not wholly unreasonable, appears to overstate the power of the exclusion's "unless determined to be Medically Necessary" clause.

The "Home Care" provision establishes that limited, short-term, in-home care is generally available under the Plan. Notably, even short-term home care is available only on a finding of medical necessity.[7] The private duty exclusion emphasizes the short-term nature of the generally available in-home care by specifically excluding full-time, in-home care from Oxford's regular benefits. As the Fays allege, however, the language of the exclusion suggests that in certain cases meeting the tests of Medical Necessity and prior approval by the Plan, Oxford may choose to make an exception to its general exclusion.

While the Plan promises general "Medical Care" in the form of "office visits and consultations, Hospital and Skilled Nursing Facility visits, and periodic physical examinations," this broad guarantee of basic services is constrained by the rest of the Plan's provisions. The Plan does not regularly provide the type of service the Fays seek—full-time, in-home care—but instead specifically excludes such care from its purview. Although the exclusion potentially suggests the limited availability of the private duty service, that service is confined to special cases on the basis of medical necessity and prior approval. The district court thus correctly found that the Plan does not generally allow the type of care Mr. Fay requests.

Like the district court, this Court is reluctant to draw a duty from an exclusion. Even if the placement of the private duty provision in the exclusion section suggests, as the district court believes it does, Oxford's intent to provide no private duty care, the language of the private duty exclusion, viewed objectively, is ambiguous. *See O'Neil*, 37 F.3d at 59 (requiring an "objective" review of plan provisions). Construing this ambiguity in favor of the beneficiary, this Court finds itself required to decide if Mr. Fay could have qualified for full-time home care under the apparent exception to the private duty bar. *See Masella*, 936 F.2d at 107. To so decide, this Court must determine whether Oxford's conclusion that such care was not "medically necessary" for Mr. Fay prevents the Fays from receiving private duty care as an exceptional case.

### C. *The Potential Exception to Private Duty Exclusion*

As noted, the Plan discusses the type of full-time, in-home care the Fays desire only in the context of establishing a blanket exclusion of such services from coverage. That exclusion, however, leaves a possibility of the provision of private duty care in certain cases because it includes the phrase "unless determined to be Medically Necessary and approved in advance by Health Plan." According to the Plan's definitions, services are "Medically Necessary" if they are:

> provided by a Hospital, Skilled Nursing Facility, Physician or other provider re-

---

**7.** While the "Medically Necessary" language does not appear in the "Home Care" provision itself, the introduction to Attachment A's Schedule of Benefits and Exclusions in which the "Home Care" provision appears offers benefits "only if and to the extent that they are Medically Necessary."

quired to identify or treat a Member's illness or injury and which, *as determined by Health Plan's Medical Director*, are:

1. Consistent with the symptoms or diagnosis and treatment of Member's condition, disease, ailment or injury;

2. Appropriate with regard to standards of good medical practice;

3. Not solely for the convenience of the Member, his or her Plan Physician, Hospital, or other health care provider; and

4. The most appropriate supply or level of service which can be safely provided to the Member.

(emphasis added). Because this provision gives explicit discretion to the Medical Director to determine what is "Medical Necessary", this Court will review assessments of necessity under a deferential arbitrary and capricious standard, reversing only if the Director's decision appears "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler*, 181 F.3d at 249 (quoting *Pagan*, 52 F.3d at 442). To decide whether Oxford's denial of benefits was, as the Fays allege, such an unreasonable and unsupported decision, this Court reviews Oxford's determination in light of the four-prong standard for Medical Necessity outlined in the Plan.

1. *The Medical Necessity Testimony*

■ Oxford relies on affidavits of two of its Medical Directors who have reviewed the Fay case extensively, Dr. Alan Sokolow and Dr. Arthur Dresdale. Dr. Sokolow, a Medical Director at Oxford since 1995, joined the team supervising Mr. Fay's care in 1996. After reviewing reports by Oxford employees familiar with Mr. Fay's medical condition and the records of the treatment Mr. Fay had received since 1992, Dr. Sokolow stated that "the private duty nursing care sought by Mr. Fay is not appropriate for his condition and is accordingly not Medically Necessary. Instead, the medically appropriate care would be that care offered at a Skilled Nursing Facility." Dr. Sokolow identified several reasons for his conclusion that an SNF offered the "most appropriate" type of care, namely that the staff, physical facilities, and resources available at SNFs are not available through home care. After reviewing the standards outlined in the Plan's Medical Necessary definition, Dr. Sokolow stated that "24 hour a day private duty nursing care[ ] [is] not 'the most appropriate supply or kind of service which can be safely provided to [Mr. Fay].'" (quoting Plan Certificate at p. 2, ¶ O(4)).

Dr. Dresdale, a Medical Director at Oxford since 1997 and a member of the Grievance Committee that heard the Fays' internal appeal, offered similar bases for his "unequivocal opinion" that Mr. Fay could "safely and more efficiently receive the care he requires" in a well-equipped SNF. Like Dr. Sokolow, Dr. Dresdale opined that in-home care could not maintain the levels of staff training and experience, equipment, and other medical resources that an SNF could provide. Recognizing Mr. Fay's total dependence on automatic breathing equipment and the care of others, Dr. Dresdale identified the training and education required for SNF nurses, the availability of emergency treatment facilities and backup systems, and the use of self-sufficient power sources as reasons SNF care would best serve Mr. Fay's medical needs. Based on his review of the available documents on Mr. Fay's condition, including the affidavits of the Fays' experts, and his own conversations with regional experts on chronic ventilator dependent patients, Dr. Dresdale concluded that an SNF was a superior care option.

The Fays presented counter-testimony of two physicians. The first, Dr. F. Russell Kellogg, a board-certified specialist in both internal and geriatric medicine and the Medical Director of a home health care agency, has served in both hospitals and nursing homes. After examining Mr. Fay and reviewing Mr. Fay's medical history, Dr. Kellogg concluded that "Mr. Fay would not tolerate nursing home placement due to his desire to remain independent, the medical risks to him associated with institutionalization, and his specific care needs. Institutionalization is therefore medically contraindicated in this patient's case as it would be devastating both physically and psychologically." Dr. Kellogg explained that a nursing home would have an insufficient number of skilled nurses to supply the constant one-on-one pulmonary care Mr. Fay required. Additionally, Dr. Kellogg stated that nursing homes would provide inadequate assistance feeding and frequently repositioning Mr. Fay.

The Fays' second expert, Dr. Mark F. Sloane, holds a board certification in pulmonary diseases and a special qualification in critical care. He has been Mr. Fay's physician since 1991. He noted that Mr. Fay's condition "puts him at substantial risk of the following complications: (1) lung infections ...; (2) 'plugging' of his tracheostomy, causing an obstruction of his breathing; (3) decubitis ulcers of the skin ...; and (4) bladder infections." Dr. Sloane concluded that such a high risk of complications requires "constant, intensive monitoring" and that Mr. Fay is "most appropriately and safely cared for at home with 24–hour private-duty nursing." Should such private duty nursing prove unavailable, Dr. Sloane opined that "in-hospital management [would be] the next most appropriate and safe level of care for Mr. Fay's condition." Dr. Sloane further stated that an SNF would be unsafe for Mr. Fay because the number of nurses per patient is inadequate and patients are seen less frequently than Mr. Fay would require.

The Oxford physicians' detailed explanations of their reasons for concluding that SNF care, not home care, was most appropriate for Mr. Fay indicate that private duty care was not "Medically Necessary" for Mr. Fay under the terms of the Plan. Despite the Fays' presentation of two qualified experts' opinions to the contrary, this Court cannot find Oxford's determination of medical necessity " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Kinstler,* 181 F.3d at 249 (quoting *Pagan,* 52 F.3d at 442). Oxford's directors provide ample evidence to support their conclusions that full-time, in-home care does not best satisfy the four prongs of the Plan's "Medically Necessary" test. Although the Fays understandably prefer in-home care, Oxford's conclusion that such care was not Medically Necessary so as to fit within the apparent exception to the Plan's exclusion of private duty nursing was neither arbitrary nor capricious. Thus, the Fays' claim for full-time, in-home care fails both under the Plan's general provisions and under any exception to its exclusion of private duty service.

### 2. *Conflicts of Interest*

The Fays argue, in anticipation of the Court's affirmation of Oxford's conclusion, that because Oxford had a financial stake in the determination of Mr. Fay's care, its decision reflected the influence of an overwhelming conflict of interest such that this Court should review the denial of benefits under a de novo, not an arbitrary and capricious, standard. This Court has applied de novo review when administrators having discretion over an ERISA plan's provisions were "*in fact* influenced

by [a] conflict of interest." *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir.2000) (internal quotation marks and citations omitted). Such a conflict may be "inherent" to some extent when a plan is both administered and insured by a single entity. *Id.* Even assuming the existence of such an inherent conflict here, however, no conflict appears *in fact* to have governed Oxford's determination of what is Medical Necessary for Mr. Fay. Although Oxford participated in heavy price negotiations with the Fays' home-care provider, and one of its Medical Directors commented that in-home care was "vastly more expensive" than SNF care, the testimony of Dr. Sokolow and Dr. Dresdale explained the broad range of considerations including the availability and quality of services, equipment, facilities, and emergency care justifying Oxford's selection of SNF over private duty nursing as the "most appropriate" care for Mr. Fay. The testimony thus supports this Court's conclusion that Oxford's decision rested on adequate evidence under the four prongs of the Plan's Medically Necessary definition.

Because this evidence precludes the Court from finding that a conflict of interest *in fact* affected the outcome of Oxford's review, this Court properly considered the case under a deferential, arbitrary and capricious standard. *Pulvers,* 210 F.3d at 92. Even if, therefore, the language of the Plan raised the possibility of an exception to the blanket exclusion of full-time, in-home care for certain "Medically Necessary" and pre-approved cases, Mr. Fay's claim for in-home care does not fall within the exception.

## IV.

The Fays finally assert that should the Court conclude, as it has, that Oxford properly denied the requested home care, they should still receive compensation for the 200, 4-hour visits compensable under the Plan's "Home Care" provision for the years 1999, 2000, and 2001. Under its schedule of benefits, the Plan details "Home Care" as including "[c]are in the home by Physician-supervised health professionals other than Physicians, . . . *when authorized in advance by . . . Health Plan.* Such care shall be limited to two hundred (200) home care visits per contract year." (emphasis added). The introduction to the Benefit Schedule provides further that "all services and benefits under this Certificate are available . . . *only if and to the extent that they are Medically Necessary and are provided, authorized or directed by Member's Primary Care Physician or Health Plan.*" (emphasis added). Because, as noted previously, this Court finds no basis for overturning Oxford's determination that in-home care was not the most appropriate care and therefore was not "Medically Necessary" for Mr. Fay within the Plan's definition of that term, the Fays are precluded from seeking compensation for the 200 annual visits available with approval under the "Home Care" provision. Although this Court has previously awarded the minimum value of SNF care when a health plan properly denied home care to a desiring patient under the terms of the plan, the Fays have neither requested SNF-level compensation nor taken the preliminary steps toward SNF residence previously required by this Court in granting such relief. *See generally Juliano v. Health Maint. Org.,* 221 F.3d 279 (2d Cir.2000)(awarding minimum costs of SNF care to appellants challenging denial of home care benefits). Because there is no evidence that Oxford agreed to provide "Home Care" in 1999, 2000, and 2001, this Court denies the Fays' request for compensation as raised.

## V.

This Court affirms the district court's grant of summary judgment to defendant-

appellee Oxford on the basis that the Plan's explicit language provides at best a very narrow exception to a blanket exclusion of the full-time, in-home care the Fays request. Based on Oxford's determination, neither arbitrary nor capricious, that such care is not "Medically Necessary" within the meaning of the plan, treatment of Mr. Fay cannot fall within that exception. Despite the Court's sympathy for Mr. Fay and his family, the district court's grant of summary judgment is AFFIRMED.