07-4293-cv
Pepe v. Newspaper and Mail

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: December 23, 2008    Decided: March March 12, 2009)

Docket No. 07-4293-cv

- - - - - - - - - - - - - - - - - - - -x

CARMINE J. PEPE,

                Plaintiff-Appellant,

         - v.-

THE NEWSPAPER AND MAIL DELIVERERS'-
PUBLISHERS' PENSION FUND, THE TRUSTEES
OF THE NEWSPAPER AND MAIL DELIVERERS'-
PUBLISHERS' PENSION FUND

                Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - -x

        Before:  JACOBS, Chief Judge, CALABRESI and SACK,
                 Circuit Judges.

    Appeal from an order of the United States District Court for the Eastern District of New York (Cogan, J.) dismissing Plaintiff-Appellant's complaint challenging the decision by an ERISA plan administrator to deny his claim

for a Disability Retirement Pension.  We conclude that the plan administrator's interpretation of one of the eligibility requirements for a Disability Retirement Pension was arbitrary and capricious.  We therefore reverse the district court's dismissal and remand with instructions to return the case to the Fund for reconsideration in light of this opinion.

ROBERT J. BACH, New York, N.Y., for Plaintiff-Appellant.

RUSSELL L. HIRSCHHORN, (Myron D. Rumeld, on the brief) Proskauer Rose LLP, New York, N.Y., for Defendants-Appellees.

DENNIS JACOBS, Chief Judge:

Carmine J. Pepe brought this suit to challenge the decision by an ERISA plan administrator to deny his claim for a Disability Retirement Pension.  Pepe appeals from an order of the United States District Court for the Eastern District of New York (Cogan, J.) dismissing his complaint.

Pepe is covered for disability under the Newspaper and Mail Deliverers'-Publishers' Pension Plan (the "Plan"), which is administered by the defendant, the Newspaper and Mail Deliverers'-Publishers' Pension Fund (the "Fund").  The

Fund denied Pepe's claim on the ground that Pepe did not meet the Plan's requirement of having "accrued a Year of Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date." The Fund construed this language as requiring Pepe to have submitted an application within one "Accrual Year" following the last "Accrual Year" in which he was credited with a "Year of Vesting Service." Pepe's last "Year of Vesting Service" was apparently the year ending January 31, 1998, and, according to the Fund, Pepe did not "apply" for a Disability Retirement Pension until 2003 at the earliest.

As discussed below, however, the Plan nowhere provides that a participant must apply within any time frame; and such a requirement would conflict with other provisions of the Plan. Additionally, Pepe alleges that he called the Fund in 1998, and was advised that he had to secure federal disability benefits before he could submit an application to the Fund. Pepe won a federal disability award in 2003. His call to the Fund promptly thereafter was treated as an application--and denied as untimely. The Fund does not explain why Pepe's 2003 phone call was sufficient to constitute an application, whereas the alleged 1998 phone

3

call was insufficient.

## BACKGROUND

From 1973 to 1992, Pepe worked as a newspaper deliverer for several employers that had entered into collective bargaining agreements with the Newspaper and Mail Deliverers' Union (the "Union"). The employers made regular contributions to the Fund on Pepe's behalf.

The Fund is an "employee benefit pension plan" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1002(2)(A). The Fund's Board of Trustees has sole authority to interpret and apply the Plan, and resolve all disputes concerning its operation.

While employed by the New York Post in June 1992, Pepe was allegedly rendered unable to work by an on-the-job accident. He began receiving New York State workers' compensation benefits on an interim basis. Under the terms of the Plan, so long as he received such interim benefits, he was still considered "employed," and the New York Post continued to make contributions to the Fund on his behalf. That arrangement lasted for about five years, during which time Pepe was credited with "Shifts of Service" and "Years

of Credited of Service" as defined in the Plan. By the end of 1997, Pepe had accumulated twenty-four years of Credited Service.

On February 6, 1998, the Workers' Compensation Board issued a final determination classifying Pepe as "permanently partially disabled," and settled his claim for a lump sum. Accordingly, the New York Post ceased making contributions to the Fund on Pepe's behalf,[1] and he accumulated no further "Shifts of Service" or "Years of Credited Service."

Pepe alleges that in early 1998, shortly after the decision of the Workers' Compensation Board, he telephoned the Fund and spoke with someone named Cathy, presumably the Fund's long-serving office manager, Catherine Revy. Pepe

---

[1] It is unclear from the record exactly when the New York Post made its last contribution to the Fund on Pepe's behalf. An arbitrator, as well as the Fund's office manager, Catherine Revy, both suggested that the Fund last received a contribution on Pepe's behalf "in 1997". However, the Fund's counsel wrote a letter to Pepe stating that the Fund last received a contribution on Pepe's behalf in January 1998. In light of the fact that Pepe's worker's compensation award was dated February 1998, it seems more likely that January 1998 was the last contribution. The Neutral Trustee and Catherine Revy may have referenced 1997 as "Accrual Year" 1997, which would include January 1998, since the Fund's "Accrual Year" runs from February 1 to the following January 31.

5

claims that he asked her what he had to do to receive a Disability Retirement Pension,[2] that she told him he would first have to apply for and receive a Social Security Disability Award ("SSDA"), and that he followed her advice and applied for an SSDA.

Revy testified that she does not remember receiving a phone call from Pepe in 1998, but that, if Pepe had called, she would not have told him to get an SSDA first. Under the terms of the Plan, as we explain below, Pepe did not need to obtain an SSDA prior to applying for a Disability Retirement Pension from the Fund.

Eligibility for various types of pensions depends on a member's "Shifts of Service" per "Accrual Year." The "Accrual Year" is defined as the year from February 1 to the following January 31. An employee who works one hundred "Shifts of Service" within any Accrual Year is credited with a "Year of Vesting Service" for that year. An employee who works 224 or more Shifts of Service earns a year of

---

[2] The Fund offers different types of pensions. In a nutshell, a Disability Retirement Pension allows an employee who is not yet 65, and becomes disabled, to retire and immediately begin receiving the full monthly "Normal Retirement Pension," which is otherwise available only after age 65.

"Credited Service".

Once an application for a pension is submitted to the Trustees, and approved, payments begin. The "Annuity Starting Date" is defined, for relevant purposes, as "the first day on which all events have occurred which entitle the Member to such benefit."

The specific requirements for a Disability Retirement Pension are set forth in Section 5.4 of the Plan.[3] Under subsection 5.4.1, permanently disabled employees who have at least fifteen years of "Credited Service" are eligible to apply for a Disability Retirement Pension if, inter alia, they have "accrued a Year of Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date".[4]

---

[3] In all relevant aspects, the requirements are stated similarly in the Plan itself and the Summary Plan Description ("SPD").

[4] Subsection 5.4.1 sets forth:

> Any Active Member (i) who has at least 15 years of Credited Service and (ii) who then becomes totally and permanently disabled pursuant to Subsection 5.4.3, and (iii) has accrued a Year of Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date, and has at least 52 Shifts of Service in the Pension Period immediately prior to the Pension Period during which he ceased to work in Covered Employment due to his

7

Under subsection 5.4.2., members who have as few as ten years of "Credited Service" are also eligible to apply for a Disability Retirement Pension, if they meet additional criteria: <u>inter alia</u>, they must be injured "on-the-job"; receive a "Social Security Retirement award"[5]; and have "accrued a Year or Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date."[6]

---

disability, shall be eligible to retire and shall, upon filing the application prescribed by the Trustees, be eligible for a Disability Retirement Pension as provided in Section 6.4.

[5] A "Social Security Retirement award" is evidently a disability award. The Plan describes it as an award given to one who "becomes totally and permanently disabled as a result of an on-the-job accident."

[6] Subsection 5.4.2 sets forth:

Any Active Member (i) who has at least 10 years of Credited Service and (A) who then becomes totally and permanently disabled as a result of an on-the-job accident resulting in a Social Security Retirement award, has accrued a Year of Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date, and has at least 52 [S]hifts of [S]ervice in the Pension Period immediately prior to the Pension Period during which he ceased to work in Covered Employment due to his disability, . . . shall be eligible to retire and shall, upon filing the application prescribed by the Trustees, be eligible for a

8

Since Pepe had more than fifteen years of Credited Service in 1998, he could have applied for a Disability Retirement Pension under subsection 5.4.1, without first obtaining any Social Security award.

After five years of litigation, Pepe received a Social Security Disability award in January 2003.[7]  On February 24, 2003, Pepe called the Fund and spoke to Revy.  (The contents of this phone call are not in dispute.)  Pepe told Revy that he had received a Social Security award, and now wanted to apply for a Disability Retirement Pension from the Fund. Revy responded that he was no longer eligible for a Disability Retirement Pension because "the last time he was credited with shifts was in the year 1997," and, "[o]ne of the requirements for a Disability Pension is that a plan participant must have accrued a year of Vesting Service in the accrual year preceding retirement."  (Catherine Revy Memo to File).

Subsequently, on April 9, 2003, counsel to the Fund advised Pepe that the Fund was treating his February 24,

---

Disability Retirement Pension as provided in Section 6.4.

[7] The award was made retroactive to 1998.

2003 phone call as a request for a Disability Retirement Pension and denying it. The letter explained that, "since the Fund did not receive contributions on your behalf since January 1998, it cannot credit you with any additional credited shifts . . . . Therefore, you have not met the requirements for a disability [retirement] pension."

Pepe appealed to the Board of Trustees by letter dated September 19, 2003. He argued that he had not applied in 1998 because he had been told by Catherine Revy that he needed to get a Social Security award first. The Fund's Board of Trustees were deadlocked as to whether to grant Pepe's appeal, and so, as per the terms of the Plan, Pepe's appeal was referred to an arbitrator (the "Neutral Trustee").

The Neutral Trustee held an initial hearing on April 20, 2004, at which Pepe testified, inter alia, about his conversations in 1998 and 2003 with Catherine Revy. At the end of the hearing, the Neutral Trustee directed the Fund to send Pepe an application form for a Disability Retirement Pension. A second hearing took place on December 16, 2004, at which Catherine Revy testified that she had no recollection of any 1998 conversation with Pepe concerning

10

his application for a disability pension. Moreover, she said that if Pepe had called in 1998, she would not have told him to apply for an SSDA since he had more than fifteen years of Credited Service. Instead, she would have told him to make an appointment with one of the Fund's doctors.

The Neutral Trustee upheld the Fund's denial of Pepe's Disability Retirement Pension by written decision dated April 5, 2005. The Neutral Trustee wrote that although Pepe had more than fifteen years of Credited Service, and it "appear[ed]" that he was "totally and permanently disabled," he had failed to "accrue a Year of Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date": "the critical test here is whether Pepe accrued a [Y]ear of [V]esting [S]ervice in the [A]ccrual [Y]ear immediately prior to the [A]nnuity [S]tarting [D]ate. That is, in 2003. The record clearly reflects that he did not. For the New York Post made no contributions on his behalf in 2003. Or, for that matter, since 1997."

The Neutral Trustee considered Pepe's argument that he had relied detrimentally on advice from Catherine Revy, but held that, even if Revy had given Pepe such advice, Pepe should not have relied on it in light of the "clear terms"

11

of the Plan: "Under the clear terms of the Plan, Pepe's claim falls short. . . . I have no reason to question Pepe's testimony or his credibility. It matters not. Even if Pepe was misled, or misinterpreted what he was told, the fact remains that the terms of the Plan govern."

Pepe filed this suit against the Fund and its Trustees (collectively "defendants") on October 6, 2006. He alleges that the denial of his claim was arbitrary and capricious, under 29 U.S.C. § 1132(a)(1)(B),[8] and that the Trustees breached their fiduciary duties to him by misinforming him of the procedures to obtain a Disability Retirement Pension, in violation of 29 U.S.C. § 1004, and by depriving him of a full and fair review of his claim, in violation of 29 U.S.C. § 1133.[9]

By Order entered February 26, 2007, the district court

---

[8] Pepe's complaint cites § 1132(a)(1)(A), but is clearly brought under § 1132(a)(1)(B).

[9] Pepe's complaint originally alleged two other causes of action, but he voluntarily dismissed them at a pretrial conference on November 20, 2006. These were: (1) a claim that the arbitrator's ruling was arbitrary and capricious because it added a term or condition not found in the Plan or SPD; and (2) a claim that if there is a rule that Plan participants must file a written application prior to payment of a Disability Retirement Pension, such a rule was not disclosed to Plan participants, in violation of 29 U.S.C. § 1022(b) and various Labor Department regulations.

12

granted summary judgment in favor of the defendants with respect to Pepe's "full and fair hearing claim" and his claim challenging the denial of his Disability Retirement Pension. As the court later explained,[10] it found "nothing arbitrary or capricious" about the Neutral Trustee's interpretation of the Plan because an application deadline was implied in subsection 5.4.1: "the key language requires that [Pepe] be deemed to have ceased work within one year of the date he applied for benefits." Although "the provision does not say that failure to apply within that period will effect a forfeiture of pension rights, . . . it seems quite obvious that anyone applying outside the defined period would not fall within the requirement . . . ." (emphasis added).

After additional limited discovery (relating to Catherine Revy's position at the Fund), the district court dismissed Pepe's remaining breach of fiduciary duty claim by

---

[10] Judge Cogan's textual analysis of section 5.4.1. of the Plan is not contained in his initial order dismissing the claim, but rather his later order, entered September 4, 2007. The initial order was a summary dismissal of the claim.

Memorandum Decision and Order entered September 4, 2007.[11]

Pepe timely appealed.

**DISCUSSION**

**I**

"We review de novo a district court's decision granting summary judgment in an ERISA action based on the administrative record and apply the same legal standard as the district court."[12]  McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 130 (2d Cir. 2008).  See also Miller v. United Welfare Fund, 72 F.3d 1066, 1070 (2d Cir. 1995).  We affirm only when no genuine issue of material fact exists,

---

[11] Pepe eventually acknowledged that Revy was not a "fiduciary" of the Plan because she performed only ministerial duties.  See 29 C.F.R. § 2509.75-8 D-2; Varity Corp. v. Howe, 516 U.S. 489, 498 (1996)(noting that a "'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." (quoting 29 U.S.C. § 1002(21)(A))).

[12] Evidence concerning Catherine Revy's responsibilities at the Fund is the only evidence considered by the district court not in the administrative record. Since Pepe eventually conceded that Revy was not a fiduciary, see supra n. 11, we need not consider such evidence here.

and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Since the terms of the Plan grant the Trustees discretionary authority to interpret the Plan, the standard governing the district court's review, and accordingly our review here, is the arbitrary-and-capricious standard. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Miller, 72 F.3d at 1070 ("When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, [we] must review deferentially a denial of benefits challenged under § 502(a)(1)(B)."). Under this deferential standard of review, we will not overturn the Neutral Trustee's denial of benefits unless his decision is found to be "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441-42 (2d Cir. 1995). Nevertheless, "where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." McCauley, 551 F.3d at 133 (quoting Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 93 (2d Cir. 2000)).

15

We construe ERISA plans according to federal common law, see, e.g., Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002), and interpret them "in an ordinary and popular sense as would a person of average intelligence and experience." Critchlow v. First UNUM Life Ins. Co. of America, 378 F.3d 246, 256 (2d Cir. 2004)(quoting Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1452 n.1 (5th Cir. 1995)(White, Associate Justice (Ret.), sitting by designation)).

It is undisputed that Pepe accrued no Shifts of Service or Years of Vesting Service after January 1998. The Neutral Trustee denied Pepe's claim because he determined that Pepe had not "accrued a Year of Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date." The Neutral Trustee's decision rests on one, or both, of two assumptions: (1) the "Annuity Starting Date" cannot be made retroactive to some appropriate date in 1998; and (2) Pepe did not actually apply to the Fund until 2003 or 2004. Neither assumption is warranted on this record.

**II**

The requirement that a member must "accrue a Year of

16

Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date" means that the Annuity Starting Date may not incept more than one Accrual Year after the last Year of Vesting Service. But it does not follow that a member must <u>submit</u> an application within that timeframe, nor does the Plan or SPD state that an Annuity Starting Date cannot be made retroactive.[13] The starting date of an annuity can pre-date the decision granting the award, or even the application, by the common expedient of a retroactive payment.

The assumption--made by the Neutral Trustee and the district court--that an Annuity Starting Date may not be made retroactive is incompatible with the structure of the Plan. Absent retroactivity, a member would have to apply within the Accrual Year <u>and</u> the Fund would have to act on the application within the Accrual Year. If the ruling below were sound, the Fund could deny a timely application simply by delaying consideration beyond the last possible (non-retroactive) Annuity Starting Date. At oral argument,

---

[13] The SPD urges members that applications should be submitted "at least 30 days (but not more than 90 days) before you wish benefit payments to begin." This suggestion says nothing about retroactivity either.

17

counsel for the defendants acknowledged that in practice the Fund <u>does</u> make the Annuity Starting Date retroactive, so long as an application is submitted within the Accrual Year following his last Year of Vesting Service; but this sensible accommodation confirms that the Plan and SPD do <u>not</u> require an application be submitted by any particular date. And any such requirement would have to be express in order to comply with 29 U.S.C. § 1022(b), which requires an SPD to contain, among other things, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."[14]

Further, retroactivity is positively necessary to the administration of some features of the Plan. Subsection 5.4.2 allows members with only ten (or more) years of Credited Service to be eligible to apply for a Disability

---

[14] The Labor Department's regulations expand on the statutory obligation to disclose "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits . . . ." The regulations require that an SPD disclose the "circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by paragraphs (j) and (k) of this section." 29 C.F.R. § 2520.102-3(l).

18

Retirement Pension if they are injured in an "on-the-job accident resulting in a Social Security Retirement award," and they have "accrued a Year of Vesting Service in the Accrual Year immediately prior to the Annuity Starting Date." To be eligible for a pension under this subsection, a member would have to apply for and receive a Social Security award and then submit an application to the Fund. Under the Fund's interpretation of the Plan, all this would have to be accomplished within one Accrual Year of the last Year of Vesting Service. Yet it took Pepe five years to apply for and receive his SSDA, and his experience is not unheard of.[15] It would be arbitrary to condition pension eligibility on prompt action by the Social Security administration.

The relevance of subsection 5.4.2 is by no means hypothetical. The Neutral Trustee considered Pepe's

---

[15] According to the Social Security Administration, a typical disability case may be resolved in three to five months. See What You Should Know Before You Apply for Social Security Disability Benefits, *available at* www.ssa.gov/disability/Adult_StarterKit_Factsheet.pdf. However, many cases take far longer. See, e.g., Brihn v. Astrue, 582 F.Supp.2d 1088 (W.D. Wis. 2008)(seven-year delay on the part of the Commissioner of Social Security in resolving applicant's case). The three-to-five month period assuredly does not take into account the rights of appeal within the Social Security Administration and in the courts.

eligibility for a Disability Retirement Pension only under subsection 5.4.1.[16] But there is no indication in the Plan that a member with more than fifteen years of Credited Service <u>must</u> be considered under subsection 5.4.1, and <u>cannot</u> instead apply under subsection 5.4.2. If Pepe's application is considered as arising under subsection 5.4.2 (there seems to be no reason not to), he would meet the requirement that his on-the-job injury resulted in a Social Security award, and he would have done <u>precisely</u> what subsection 5.4.2 demands prior to submitting his application to the Fund: apply for and receive a Social Security award. But under the interpretation of the Plan adopted below, his Disability Retirement Pension would be denied on the ground that the Social Security Administration took more than a year to decide his case.

In light of these considerations, particularly the lack of an explicit provision in the Plan or SPD that sets forth a particular timeframe in which members must apply, the

---

[16] The Neutral Trustee wrote that "[A]n active member must have at least 15 years of Credited Service . . . Pepe, to be sure, has the requisite years." There is no indication that the Neutral Trustee considered the alternate set of requirements for members with more than ten years of Credited Service.

denial of Pepe's Disability Retirement Pension claim was arbitrary and capricious.

## III

The Fund's failure to explain its treatment of the alleged 1998 phone call also renders its denial arbitrary and capricious.  To apply for a Disability Retirement Pension under either subsection 5.4.1 or 5.4.2, a member must "fil[e] the application prescribed by the Trustees."  But Pepe's 2003 phone call was treated as an application, which was formally denied by a letter from the Fund's outside counsel.  It is not clear why Pepe's 1998 phone call to the Fund would not be treated the same way.  The Neutral Trustee credited Pepe's testimony that he had in fact made the call,[17] and there is no dispute that an application in 1998 would have been timely, Pepe having clearly accrued a Year of Vesting Service in 1997.

## IV

If the decision of the Trustees denying a pension is

---

[17] The Neutral Trustee wrote that he had "no reason to question Pepe's testimony or his credibility."

21

"arbitrary and capricious, [the case] must [be] remand[ed] to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" Miller, 72 F.3d at 1071 (citations omitted).

On this record, additional evidence might produce a reasonable conclusion permitting denial of Pepe's claim.

First, both subsections 5.4.1 and 5.4.2 contain an additional requirement, not yet discussed, that a member must have accrued "52 Shifts of Service in the Pension Period immediately prior to the Pension Period during which he ceased to work in Covered Employment due to his disability."[18] The record is unclear as to when the New York Post stopped its contributions to the Fund on Pepe's behalf, and hence when Pepe ended his Covered Employment; nor does the record show how many Shifts of Service Pepe accrued in his penultimate "Pension Period."

Second, it has not been established that Pepe is "totally and permanently disabled" under the terms of the

---

[18] The Plan defines "Pension Period" as any of the three month periods from February to April, May to July, August to October, or November to January.

Plan. The Neutral Trustee noted that, "it appears[] the Social Security Administration has determined that [Pepe] is totally and permanently disabled." But the Plan requires a member to be found "totally and permanently disabled . . . [in] the opinion of a medical examiner appointed by the Trustees." The determination of the Social Security Administration may or may not be sufficient.

For these reasons, the appropriate course here is to remand the case to the district court with instructions to remand to the Fund for further proceedings in light of this opinion.[19]


## CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded with instructions to return the case to the Fund for reconsideration in light of this opinion.

---

[19] In light of our remand, we need not address Pepe's alternative causes of action. Were he to prevail on these alternative theories, he would not be entitled to any more relief than under 29 U.S.C. § 1132(a)(1)(B). See Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134 (1985)(fiduciaries to defined benefit employee benefit plans cannot be held personally liable to plan participants for extra-contractual compensatory or punitive damages caused by improper or untimely processing of benefit claims).